UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jane Doe,                                          File No. 21-cv-2649 (ECT/TNL)

      Plaintiff,

v.                                                              **OPINION AND ORDER**

Anoka County; James Stuart, *the Anoka
County Sheriff in his official capacity*; and
Detective Larry Johnson, *now retired, in his
individual and official capacity*,

      Defendants.

---

Charles J. Lloyd and Adam Hagedorn, Livgard, Lloyd & Christel, PLLP, Minneapolis, MN, for Plaintiff Jane Doe.

Jason J. Stover, Anoka County Attorney's Office, Anoka, MN, for Defendants Anoka County, Anoka County Sheriff James Stuart, and Detective Larry Johnson.

---

      Plaintiff Jane Doe was raped in 2004, when she was fourteen. In this case brought under § 1983, the Minnesota Human Rights Act, and Minnesota common law, Doe seeks damages arising from Defendants' investigation of the rape, at least one Defendant's misrepresentations concerning the investigation's status, and Defendants' failure to timely or successfully prosecute her rapist. The core allegation supporting Doe's federal claims is that her rape kit—like nearly 500 others in the Anoka County Sheriff's custody—was not timely tested. In Doe's case, her kit was left untested for many years.

      This is the case's second turn in this Court. In the first, Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Defendants

raised jurisdictional-, limitations-, merits-, and immunity-based arguments. The motion was granted on just a jurisdictional ground. The settled rule is that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution" because "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Applying this rule, I concluded Doe lacked Article III standing to pursue her claims in federal court.

Doe appealed. During the appeal's pendency, the Eighth Circuit decided *Pratt v. Helms*, 73 F.4th 592 (8th Cir. 2023). In *Pratt*, the court held that a crime victim who "brings a class-of-one equal protection claim" lacks standing to sue based on an official's failure to investigate the alleged perpetrator. *Id.* at 595. The Eighth Circuit subsequently reversed and remanded the order dismissing this case, with the instruction to consider "Doe's complaint in light of *Pratt*." *Doe v. Anoka County*, No. 22-3012, 2024 WL 765008, at *1 (8th Cir. Feb. 26, 2024) (per curiam).

Applying *Pratt*, I conclude Doe has standing to sue, though based only on her claims that Defendants' investigative failures were due to alleged discriminatory animus against women and girls. This conclusion, in turn, requires consideration of the limitations-, merits-, and immunity-related grounds Defendants raised in their original Rule 12(c) motion. These additional grounds justify dismissal of Doe's Minnesota Human Rights Act claim and her negligence claim, but nothing more. To summarize, Doe's Minnesota Human Rights Act claim does not survive a statute-of-limitations challenge, but the other claims do. Doe plausibly alleges an equal-protection claim. And

2

though Defendants' immunity challenges are for the most part unpersuasive, Detective Johnson, and by extension Sheriff Stuart, are entitled to official immunity with respect to Doe's negligence claim.

I[1]

Jane Doe was sexually assaulted in Anoka County in 2004, at the age of fourteen. Compl. [ECF No. 1] ¶¶ 1, 29.  After the assault, Doe underwent a medical examination and provided evidence for a rape kit that was submitted to the Anoka County Sheriff's Office. *Id.* ¶¶ 2–3, 31.  Doe also identified her assailant. *Id.* ¶ 33.

Defendant Detective Larry Johnson was assigned to investigate Doe's case. *Id.* ¶¶ 4, 36.  During his investigation, Detective Johnson told Doe's mother that no DNA had been obtained from a test of Doe's rape kit. *Id.* ¶¶ 6, 38.  This statement was false or misleading because Doe's rape kit had not been tested at that time. *Id.* ¶¶ 5, 15, 40.  Doe's rape kit wasn't tested because "[t]he Anoka County Sheriff's Office implemented and established a custom and practice of routinely failing to submit rape kits for testing." *Id.* ¶ 7.

Doe's assailant was charged. *Id.* ¶ 37.  The criminal case against the assailant was dismissed, however, for reasons unrelated to the lack of DNA evidence. *Id.* ¶ 39; *see*

---

[1]    A Rule 12(c) motion for judgment on the pleadings is decided under the same standard as a Rule 12(b)(6) motion to dismiss. *Spagna v. Phi Kappa Psi, Inc.*, 30 F.4th 710, 715 (8th Cir. 2022).  In accordance with that standard, the facts are drawn entirely from the Complaint and documents embraced by it. *Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022).  Documents embraced by the Complaint here include the State's Dismissal of Complaint and the Bureau of Criminal Apprehension's Report on the survey of untested rape kits. *See* Stover Decl. Exs. A–B [ECF Nos. 30-1, 30-2]; *see also* Compl. ¶¶ 39, 42–48.

*also* Pl.'s Mem. in Opp'n [ECF No. 34] at 2[2]  ("The charges against the man that Doe identified as her assailant were eventually dropped for reasons unrelated to the lack of DNA evidence.").  The State of Minnesota filed a notice dismissing the case "without prejudice" in late 2004.  Stover Decl. Ex. A.  The State offered the following reason for its dismissal of the case: "In the interests of justice because the State is unable to prove the []charged offense beyond a reasonable doubt."  *Id.*

More than ten years later, in 2015, the Minnesota Legislature passed a bill requiring Anoka County to inventory untested rape kits in the county's possession that were collected before July 1, 2015.  *Id.* ¶¶ 9, 42–44.  As a result, Anoka County reported a backlog of 495 untested rape kits to the Minnesota Bureau of Criminal Apprehension.  *Id.* ¶¶ 9, 45–46.  In 2018, the Anoka County Sheriff's Office was awarded a federal grant to fund the testing of its backlog of untested rape kits.  *Id.* ¶ 50.  Doe's rape kit was tested in 2020.  *Id.* ¶¶ 12, 51.  The testing revealed DNA evidence leading to criminal charges against Doe's assailant.  *Id.* ¶¶ 52, 54–55.  Neither Doe nor Defendants submitted or identified information showing the status or outcome of these criminal charges, and a public records search has yielded no trustworthy answer.

Doe asserts five claims in this case: (1) Under 42 U.S.C. § 1983, Doe asserts a Fourteenth Amendment equal-protection claim, *see* Compl. ¶¶ 58–85, alleging the County and Sheriff "followed an unwritten and ongoing policy or custom of responding differently and affording less protection to sexual assault victims, who were, almost

---

[2]    Page cites are to CM/ECF pagination appearing in a document's upper right corner, not to a document's original pagination.

exclusively women and girls," *id.* ¶ 61. (2) Under the Minnesota Human Rights Act, specifically Minn. Stat. § 363A.12, subdiv. 1, Doe alleges that the County and Sheriff's routine failure to test rape kits discriminated against women and girls in the provision of public services. Compl. ¶¶ 86–99. (3) Doe alleges that the Sheriff's failure to test rape kits was deliberately indifferent to the rights of women and girls, in part because "[t]he Anoka County Sheriff's Office['s] training practices were inadequate in investigating sexual assaults." *Id.* ¶¶ 100–07. Though Doe does not specify a source of law for this claim, it is understood to be asserted under § 1983's *Monell*/*Canton* line of cases. (4) Under Minnesota common law, Doe asserts a negligence claim against the Sheriff and Detective Johnson, *id.* ¶¶ 108–15, alleging they breached duties to her resulting in "embarrassment and mental and emotional distress due not only to being sexually assaulted but also that none of the defendants believed her," *id.* ¶ 114. (5) Under Minnesota common law, Doe asserts a claim for intentional infliction of emotional distress against the Sheriff and Detective Johnson. *Id.* ¶¶ 116–21. Doe seeks compensatory and punitive damages, attorneys' fees and costs, and unspecified "[o]ther just relief." *Id.* at 17, ¶¶ 1–5. Doe seeks no injunctive or declaratory relief. *See id.*

## II

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 971 (8th Cir. 2018) (internal quotation omitted). A motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion. *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Under

that standard, a court must accept as true all well-pleaded factual allegations in the relevant pleadings and draw all reasonable inferences in the non-moving party's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). A pleading's allegations must "state a claim to relief that is plausible on its face." *Id.* at 570.

A

The first step is to revisit whether Doe has Article III standing to bring this case. Settled principles preserve separation of powers among the federal branches and ensure that federal courts stay in their case-and-controversy lane:

> Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies. Therefore, the plaintiff's standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an "injury-in-fact," (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). "[P]rimarily future injuries . . . 'may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Dep't of Com. v. New*

6

*York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  "[S]tanding is based on the facts as they existed at the time the lawsuit was filed." *Steger*, 228 F.3d at 893.  Standing "must exist not only at the time the complaint is filed, but through all stages of the litigation."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation omitted).

Supreme Court precedents establish the rule that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."  *Linda R.S.*, 410 U.S. at 619 (collecting cases).  In *Linda R.S.*, the plaintiff, "the mother of an illegitimate child," sued to enjoin a Texas district attorney from refusing to enforce against the child's biological father a Texas statute criminalizing the "willful[] desert[ion], neglect, or refus[al] to provide for the support and maintenance of his" minor child.  *Id.* at 614–16.  The district attorney "refused to take action [against the child's father] for the express reason that, in his view, the fathers of illegitimate children were not within the scope of [the statute]."  *Id.* at 615–16.  The mother sued "on behalf of herself, her minor daughter, and on behalf of all other women and minor children who have sought, are seeking, or in the future will seek to obtain support for so-called illegitimate children from said child's father."  *Id.* at 619–20 (quotation omitted) (White, J., dissenting).  After repeating the basic standing rule that "federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction," *id.* at 617, the Supreme Court held that, "in the unique context of a challenge to a criminal statute, [the plaintiff] ha[d] failed to allege a sufficient nexus between her injury and the government

7

action which she attacks to justify judicial intervention, *id.* at 617–18.  To support this holding, the Court first observed that the plaintiff "made no showing" that her injury (the failure of the child's father to contribute support payments) resulted from the district attorney's non-enforcement of the statute.  *Id.* at 618.  As the Court explained, "if [the plaintiff] were granted the requested relief, it would result only in the jailing of the child's father," not necessarily the payment of support.  *Id.*  Second, the Court observed that its prior decisions "demonstrate that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *Id.* at 619.  As the Court noted recently in *United States v. Texas*, this "Article III standing principle remains the law today."  599 U.S. 670, 677 (2023).

Two Eighth Circuit cases applying *Linda R.S.*'s standing principles figure centrally in the standing analysis here.  The first is *Parkhurst v. Tabor*, 569 F.3d 861 (8th Cir. 2009).  There, the court recognized that, "[w]hile it is well settled that defendants subjected to or threatened with discriminatory prosecution have standing to bring an equal protection claim, this right has not been extended to crime victims."  *Id.* at 865 (internal citation omitted).  The *Parkhurst* plaintiffs sued on behalf of their minor daughter to challenge a county prosecutor's policy against prosecuting cases involving "sexual abuse perpetrated by a close relative."  *Id.* at 863–64.  The plaintiffs claimed their minor daughter "was discriminated against as a member of a disfavored class they defined as victims of incestuous sexual abuse."  *Id.* at 864–65.  The plaintiffs alleged that the county prosecutor's policy—and resulting decision not to charge the child's biological father with felony sexual assault—"violated the equal protection clause by

failing to provide to victims of incest the same protection offered to other victims of sexual assault." *Id.* at 865. The Eighth Circuit quoted *Linda R.S.* for its rule that "'a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution' because 'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" *Id.* at 866 (quoting *Linda R.S.*, 410 U.S. at 619). And the Eighth Circuit observed that "[t]he lower federal courts have maintained the distinction in standing between those prosecuted by the state and those who would urge the prosecution of others, even when the failure to prosecute was allegedly discriminatory." *Id.* (collecting cases). The court recognized that crime victims might have Article III standing if they "challenge the allegedly discriminatory provision of police protection," but noted that the plaintiffs "claim[ed] to have been injured by a failure to prosecute . . . rather than by a failure to provide police protection." *Id.* at 866–67.

The second Eighth Circuit case is *Pratt v. Helms*, 73 F.4th 592 (8th Cir. 2023). Unlike *Parkhurst*, which involved a claim arising from a failure to *prosecute* an alleged crime, *Pratt* involved a claim arising from a failure to *investigate* and alleged crime. The plaintiff, Pratt, "allege[d] he was assaulted by his daughter's ex-boyfriend and the ex-boyfriend's cousin." *Id.* at 593. Pratt "reported the assault to the Camden County Sheriff's Department" but later filed suit against the department claiming it "refused to investigate the assault because the assailants were related to the county's clerk of court." *Id.* Notwithstanding the prosecution/investigation distinction, the *Pratt* panel "conclude[d] that, for purposes of Pratt's federal claims, he lack[ed] standing to challenge

the failure to investigate the assault committed against him." *Id.* at 594. The court's

reasoning deserves repeating here in full:

> We agree with the Fifth Circuit that, generally, a crime victim
> lacks standing to sue "based on [an official's] failure to . . .
> investigate [the alleged assailant]." *See Lefebure v.
> D'Aquilla*, 15 F.4th 650, 652, 655 (5th Cir. 2021)[, *cert.
> denied*, 142 S. Ct. 2732 (2022)]. Like prosecutorial
> decisions, investigative decisions are generally left to the
> discretion of the executive branch. *See id.* at 655 ("[I]t is not
> the province of the judiciary to dictate . . . investigative
> decisions to the executive branch."); *Flowers v. City of
> Minneapolis*, 558 F.3d 794, 799 (8th Cir. 2009) ("A police
> officer's decisions regarding whom to investigate and how to
> investigate are matters that necessarily involve discretion.");
> *see also Linda R.S.*, 410 U.S. at 619 (emphasizing "the
> special status of criminal prosecutions in our system"). And
> a victim has no constitutional right to an investigation of a
> crime committed against him—at least where, as here, the
> victim brings a class-of-one equal-protection
> claim. *See Flowers*, 558 F.3d at 798–800 (holding that a
> police officer's investigative decision "may not be attacked
> in a class-of-one equal protection claim" even by a criminal
> suspect); *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir.
> 2007) (noting that there is no "statutory or common law right,
> much less a constitutional right, to an investigation"). Thus,
> Pratt lacks a legally cognizable injury in fact and has no
> standing to bring his § 1983 claims.

*Id.* at 595 (footnote omitted). Clearly, *Pratt* extended *Linda R.S.*'s prosecution-directed

standing rule—*i.e.*, that "a citizen lacks standing to contest the policies of the prosecuting

authority when he himself is neither prosecuted nor threatened with prosecution," *Linda

R.S.*, 410 U.S. at 619—to claims challenging investigation-related failures. *Pratt*, 73

F.4th at 594–95.

Less obvious is whether *Pratt* should be understood to limit *Linda R.S.*'s standing

principles to "class-of-one equal-protection claim[s]." *Id.* at 595. "Class of one" refers

to equal-protection claims brought by plaintiffs who do not allege class-based discrimination, but who claim to have "been irrationally singled out as a so-called 'class of one.'" *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). To state a valid class-of-one equal-protection claim, a plaintiff must allege "that she had 'been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Id.* (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). *Pratt*'s statement that "a victim has no constitutional right to an investigation of a crime committed against him—at least where, as here, the victim brings a class-of-one equal-protection claim," appears to reflect an understanding that *Linda R.S.*'s standing principles do not apply when a plaintiff alleges the failure to prosecute or investigate another resulted from class-based discriminatory animus. *Pratt*, 73 F.4th at 595.

The Supreme Court has not answered the question explicitly, but it has said things supporting the idea that a crime-victim plaintiff has Article III standing to pursue an equal-protection claim when the victim claims to have received substandard treatment during the investigation or prosecution of the alleged perpetrator because the victim belongs to a protected class. In *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, for example, the Court observed that "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." 489 U.S. 189, 197 n.3 (1989). It seems reasonable to classify investigation and prosecution as "protective services," or at least to think they are not materially different. *See Elliot-Park v. Manglona*, 592 F.3d 1003, 1007 (9th Cir. 2010). And in *Engquist*, the

11

Court remarked: "Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns." 553 U.S. at 604. It seems reasonable to think that a failure to investigate or prosecute crimes based on the victims' race or sex would deserve the same answer. Stigmatic injury, "one of the most serious consequences of discriminatory government action," is sufficient to support Article III standing for "'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (citing *Heckler v. Mathews*, 465 U.S. 728, 739–740 (1984)).

Lower courts have addressed the question more directly in ways that support a crime victim's standing to assert this type of claim. In *Elliot-Park*, for example, the Ninth Circuit held that law enforcement officers who were "accused of failing to investigate a crime or make an arrest due to the race of the victim and that of the perpetrator" were not entitled to qualified immunity. 592 F.3d at 1005–09. The plaintiff, who had been injured by a drunk driver, claimed three officers failed to investigate the crime or arrest the drunk driver "because of racial animus against her as a Korean and in favor of [the drunk driver] as a Micronesian." *Id.* at 1006. Though the court did not discuss standing explicitly, it rejected the officers' characterization of the case as involving a "general constitutional right to have an assailant arrested." *Id.* The court explained:

> [W]hile the officers' discretion in deciding whom to arrest is certainly broad, it cannot be exercised in a racially discriminatory fashion. For example, a police officer can't investigate and arrest blacks but not whites, or Asians but not Hispanics. Police can't discriminate on the basis of the

> victim's race, either.  We recognized as much in *Estate of Macias v. Ihde*, where we held that there is no right to state protection against madmen or criminals, but "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." 219 F.3d 1018, 1028 (9th Cir. 2000); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.").

*Id.* at 1006–07.  It did not matter, the court continued, that the plaintiff "received some protection; what matter[ed] [was] that she would allegedly have received more if she weren't Korean and [the drunk driver] weren't Micronesian."  *Id.* at 1007.  Other cases support the understanding that *Linda R.S.*'s standing rule does not bar a crime victim from pursuing the type of equal-protection claim addressed by the Ninth Circuit in *Elliot-Park*.  *See, e.g.*, *Sanders v. Downs*, 420 Fed. App'x 175, 180 (3d Cir. 2011) (distinguishing a claim that government officials discriminated against a victim in their response to the crime based on an "unjustifiable classification" from the "right to the investigation or prosecution of another"); *Doe v. N. Reg'l Police Dep't of Allegheny Cnty.*, No. 2:22-cv-1628, 2024 WL 3377888, at *5 (W.D. Pa. July 11, 2024) ("There is a distinction between the right to force the prosecution of a case and the right of access to judicial procedures, like a criminal investigation, to redress an alleged wrong.  It is certainly true that police officers cannot discriminate on the basis of an alleged victim's race."); *Fulson v. City of Columbus*, 801 F. Supp. 1, 6 (S.D. Ohio 1992) (concluding that a "failure on the part of police to investigate and prosecute criminal offenders on the basis of [a victim's] race may state an equal protection claim under § 1983.").

Other signs point in the opposite direction.  Consider *Linda R.S.*  It did not involve a class-of-one equal-protection claim.   The plaintiff sued to challenge the district attorney's non-prosecution policy on the ground that it discriminated against "illegitimate children" and their mothers.  *Linda R.S.*, 410 U.S. at 619–20 (White, J., dissenting).[3]  In other words, the plaintiff in *Linda R.S.* claimed to have suffered a stigmatic injury separate from the father's non-prosecution.  Because *Linda R.S.* was not a class-of-one equal-protection case, it would seem atypical to confine its no-standing rule to class-of-one cases.   Nor did *Parkhurst* involve a class-of-one equal-protection claim. There, the plaintiffs claimed a departmental policy disfavoring prosecution of close-relative sexual-abuse cases discriminated against their victim daughter "as a member of a disfavored class they defined as victims of incestuous sexual abuse." *Parkhurst*, 569 F.3d at 864–65.  And it is noteworthy that, to support its no-standing determination, *Parkhurst* cited approvingly to *Doe v. Mayor of Pocomoke City*, 745 F. Supp. 1137 (D. Md. 1990).  *See Parkhurst*, 569 F.3d at 866, 867 n.4.  In *Pocomoke City*, three women who were raped or sexually abused sued several defendants connected to Ocean City, Maryland, and the surrounding area claiming "the defendants have followed a policy of discrimination against women" that resulted in the non-investigation and non-prosecution of the crimes.  745 F. Supp. at 1137–38.  The court dismissed the case

---

[3]      *See Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 557 (2012) (noting that the Supreme Court has "applied an intermediate level of scrutiny to laws burdening illegitimate children" (cleaned up)); *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 615 (7th Cir. 2024) ("Laws that discriminate based on sex and the marital status of a person's parents at the time of his birth receive intermediate scrutiny." (citations omitted)).

for lack of standing, *id.* at 1140, explaining it was "not aware of a constitutional, statutory, or common law right that a private citizen has to require a public official to investigate or prosecute a crime," *id.* at 1139.  In the court's view, criminal investigations and prosecutions "are discretionary public duties that are enforced by public opinion, policy, and the ballot."  *Id.*  The Eighth Circuit quoted this very sentence in *Parkhurst*, 569 F.3d at 867 n.4.  *Lefebure*, which the Eighth Circuit cited approvingly in *Pratt*, 73 F.4th at 595, did not involve only a class-of-one equal-protection claim, either.  As the district court in *Lefebure* explained, the plaintiff claimed a constitutional violation arising from the defendants' "alleged policy of disproportionate treatment of women and sexual assault victims."  *Lefebure v. Boeker*, 390 F. Supp. 3d 729, 738–39 (M.D. La. 2019), *rev'd and remanded sub nom. Lefebure v. D'Aquilla*, 987 F.3d 446 (5th Cir. 2021), *withdrawn and superseded on denial of reh'g en banc*, 15 F.4th 650 (5th Cir. 2021), *and rev'd and remanded sub nom. Lefebure v. D'Aquilla*, 15 F.4th 650 (5th Cir. 2021).  Finally, consider *James v. Willis*, No. 21-501, 2022 WL 481812 (2d Cir. Feb. 17, 2022).  There, the plaintiffs, Nation of Islam members incarcerated in a state prison, claimed they were denied equal protection when prison officials "prevent[ed] a full investigation" into vandalism of a mosque room "due to animus against [their] religion."  *Id.* at *1.  The vandal was a correction officer named Michael Comito.  *Id.* The plaintiffs argued that the discrimination they experienced was "itself . . . an injury sufficient to confer standing."  *Id.* at *2.  The court disagreed.  It explained:

> Plaintiffs' argument fails because they do not have a legally cognizable interest in whether Comito is investigated.  "[A] private citizen lacks a judicially cognizable interest in the

prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). At least one other circuit court has concluded that this rule logically extends to the criminal investigation or non-investigation of another, which, like prosecution, is a discretionary decision left to the executive branch. *See Lefebure v. D'Aquilla*, 15 F.4th 650, 652 (5th Cir. 2021) ("[V]ictims do not have standing based on whether *other* people—including their perpetrators—are investigated or prosecuted."); *id.* at 655 ("[I]t is not the province of the judiciary to dictate prosecutorial or investigative decisions to the executive branch."). We easily make that extension here because, in the matter before us, Plaintiffs styled this case as a failure to investigate a crime and failed to distinguish their arguments for standing from those rejected by *Linda R.S.*

*Id.*

Though the binding precedents leave room for misunderstanding, the better answer is that Doe possesses Article III standing to bring this case. (1) The Supreme Court's post-*Linda R.S.* cases discussed above are more easily construed to support the conclusion that a crime victim suffers at least stigmatic injury when state officials either refuse to investigate the crime or conduct a substandard investigation because of the victim's sex. That is what Doe alleges here. *See, e.g.*, Compl. ¶¶ 61, 71–72. And while, on *Linda R.S.*'s reasoning, the investigation and prosecution of her assailant may not redress Doe's injuries resulting from the assault, damages may redress Doe's stigmatic injuries resulting from Defendants' allegedly discriminatory practices. (2) It seems safer to understand *Pratt*'s statement that "a victim has no constitutional right to an investigation of a crime committed against him—at least where, as here, the victim brings a class-of-one equal-protection claim," 73 F.4th at 595, to limit *Linda R.S.*'s no-standing rule to those cases. In other words, a crime victim who sues as a member of, and based

on discriminatory animus against, an identifiable group has Article III standing to sue to the extent the victim alleges defendants' actions were directed at her and harmed her personally. (3) This distinction seems implicit in the Eighth Circuit's opinion in this case. The court cited *Linda R.S.* as involving a failure-to-prosecute claim but differentiated Doe's claim because it is "based on the Defendants' alleged failure to timely investigate the crime of sexual assault due to an alleged discriminatory animus against women and girls." *Doe*, 2024 WL 765008, at *1. For these reasons, then, I conclude Doe has plausibly alleged her Article III standing to bring this case.

B

The next question is whether statutes of limitations bar Doe's claims. A statute of limitations "is an affirmative defense that defendants bear the burden to plead and prove." *Roiger v. Veterans Affs. Health Care Sys.*, No. 18-cv-591 (ECT/TNL), 2019 WL 572655, at *7 (D. Minn. Feb. 12, 2019) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)). It is therefore "not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense." *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008); *see Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004) (recognizing that, when a defendant raises a statute-of-limitations defense on a motion to dismiss, the motion should be granted when it "appears from the face of the complaint itself that the limitation period has run" (internal quotation omitted)). This means that the plaintiff's own allegations must "clearly indicate[]" that the claims are untimely. 5B Charles Alan Wright, Arthur R. Miller et al., *Federal Practice and Procedure* § 1357 (4th ed. July 12, 2024 Update). If the complaint

"reasonably may be understood to assert a claim for relief plausibly within the limitations period," it survives. *Int'l Decision Sys., Inc. v. JDR Sols., Inc.*, No. 18-cv-2951 (ECT/DTS), 2019 WL 2009249, at *3 (D. Minn. May 7, 2019). And even when a complaint does establish that a plaintiff's claims are untimely, a plaintiff may avoid dismissal by plausibly alleging a basis to toll the statute of limitations. *See Joseph v. Wal-Mart Corp.*, No. 20-cv-1255 (ECT/TNL), 2020 WL 5995261, at *3 (D. Minn. Oct. 9, 2020) (collecting cases). The question, then, is whether the Complaint "clearly indicate[s]" that Doe's claims are untimely. 5B Wright et al., *supra*, § 1357.

The parties do not appear to dispute the limitations periods governing Doe's claims. (1) Doe's § 1983 claims—including her equal-protection claim in Count 1 and her *Monell*/*Canton* claim in Count 3—are subject to Minnesota's general personal-injury statute of limitations, and here that is six years pursuant to Minn. Stat. § 541.05, subdiv. 1(5). *See Owens v. Okure*, 488 U.S. 235, 249–50 (1989) (holding that "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions"); *Strandlund v. Hawley*, 532 F.3d 741, 746 (8th Cir. 2008) ("The statute of limitations for claims brought under 42 U.S.C. § 1983 is generally the applicable state law period for personal injury torts."); *Blackwell v. Washington County*, No. 24-cv-35 (JRT/SGE), 2024 WL 4932841, at *5 (D. Minn. Dec. 2, 2024) ("In Minnesota, § 1983 claims have a six-year statute of limitations." (citations omitted)); *Sacks v. Univ. of Minn.*, 600 F. Supp. 3d. 915, 938 (D. Minn. 2022) (applying six-year statute of limitations to Title IX and § 1983 claims pursuant to Minn. Stat. § 541.05, subdiv. 1(5)). (2) Doe's

18

MHRA claim is subject to a one-year statute of limitations.  Minn. Stat. § 363A.28, subdiv. 3(a); *see Soltis v. MHC Culinary Grp., LLC*, No. 24-cv-233 (ECT/LIB), 2024 WL 3540784, at *5 (D. Minn. July 25, 2024) ("Under the MHRA, claims of unfair discriminatory practice must be filed either as a civil action or charged with a commission within one year of the occurrence of the practice.").  (3) A six-year limitations period governs Doe's negligence claim.  *See Strandlund*, 532 F.3d at 746 (citing Minn. Stat. § 541.05, subdiv. 1(5)).  (4) And Doe's claim for intentional infliction of emotional distress is subject to a two-year statute of limitations.  *See Rassier v. Sanner*, 996 F.3d 832, 836 (8th Cir. 2021) (citing Minn. Stat. § 541.07(1)).

Nor do the parties appear to dispute the accrual rules governing each of Doe's claims.  (1) "When a § 1983 cause of action accrues (and the statute of limitations begins to run) is an issue of federal law." *Martin v. Julian*, 18 F.4th 580, 583 (8th Cir. 2021) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." (emphasis in original))); *Rassier*, 996 F.3d at 836 ("When a section 1983 claim accrues 'is a question of federal law.'" (quotation omitted)).  These claims "accrue 'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *Humphrey v. Eureka Gardens Pub. Facility Bd.*, 891 F.3d 1079, 1081–82 (8th Cir. 2018) (quoting *Wallace*, 549 U.S. at 388) (addressing § 1983 claims); *see also Graham v. City of Manassas Sch. Bd.*, 390 F. Supp. 3d 702, 710 (E.D. Va. 2019) (concluding that federal law governs when § 1983 and Title IX claims accrue, not state accrual statute, and applying "standard rule" from *Owens* that accrual occurs

when the plaintiff knows or has reason to know of his injury).  The "cause of action accrues even though the full extent of the injury is not then known or predictable." *Rassier*, 996 F.3d at 837 (quoting *Wallace*, 549 U.S. at 391).  (2) For Doe's MHRA claim, "[t]he one-year limitations period begins to run when the discriminatory act occurs, not 'when the consequences of that act become most painful.'"  *Eichinger v. Imation Corp*., No. A05-1133, 2006 WL 852123, at *6 (Minn. Ct. App. Apr. 4, 2006) (quoting *Turner v. IDS Fin. Servs. Inc*., 471 N.W.2d 105, 107–08 (Minn. 1991)).  (3) The limitations period governing Doe's negligence claim "begins to run . . . on the occurrence of any compensable damage, whether specifically identified in the complaint or not." *Antone v. Mirviss*, 720 N.W.2d 331, 336 (Minn. 2006).  "This rule strikes a balance between the 'occurrence' rule, which assumes that the cause of action accrues simultaneously with the negligent act, and the 'discovery' rule, under which the cause of action accrues only when a 'plaintiff knows or should know of the injury.'"  *Gearin v. Bailey's Nurseries, Inc.*, No. A11-595, 2012 WL 34035, at *2 (Minn. Ct. App. Jan. 9, 2012) (quoting *Antone*, 720 N.W.2d at 335).  (4) The limitations period governing Doe's intentional-infliction-of-emotional-distress claim accrues "on the date of the tortious act."  *Rassier*, 996 F.3d at 838 (citing *Krause v. Farber*, 379 N.W.2d 93, 97 (Minn. Ct. App. 1985)).

It is not obvious when these limitations periods began to run with respect to Doe's claims, but it doesn't matter.  Defendants argue that each period began to run no later than December 9, 2004, when the first criminal case involving Doe's sexual assault was dismissed, Defs.' Mem. in Supp. [ECF No. 29] at 14, and Doe does not dispute this, *see*

Pl.'s Mem. in Opp'n.[4]  On this understanding, each of Doe's claims would be barred by the corresponding limitations period.  She did not commence this case until December 2021.  *See* ECF No. 1 (indicating filing date); Affs. of Service [ECF Nos. 5–7]; *see also Forward v. Murrell*, No. 3:08cv3, 2010 WL 432401, at *2 (D.N.D. Feb. 1, 2010).

To get past this problem, Doe argues the limitations periods were equitably tolled based on Detective Johnson's statement to Doe's mother in 2004 that no DNA had been obtained from a test of Doe's rape kit.  Compl. ¶¶ 6, 38.  "[E]quitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued [her] rights diligently but some extraordinary circumstance prevents [her] from bringing a timely action."  *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014).  "[W]hen a federal court borrows a state statute of limitations to gap-fill, as with . . . § 1983, the general rule is that the federal claims 'may be subject to any tolling rules that [state] courts have applied to that statute.'"  *Sacks*, 600 F. Supp. 3d. at 940–41 (quoting *DeVries v. Driesen*, 766 F.3d 922, 922–24 (8th Cir. 2014)); *see Wallace*, 549 U.S. at 394 ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitations.").  "Minnesota law recognizes only one general equitable tolling exception, which arises when the plaintiff can demonstrate that the defendant engaged in fraudulent concealment."  *Lamere v. St. Jude Med., Inc.*, 827 N.W.2d 782, 788 (Minn. Ct. App. 2013) (citing *DeCosse v. Armstrong Cork Co.*, 319 N.W.2d 45, 51–52 (Minn. 1982)); *see*

---

[4]    It seems reasonable to think that the first alleged discriminatory damage-causing act occurred much earlier—when Defendants first gave Doe's case substandard investigative treatment based on her sex resulting in some injury to Doe.  The Complaint does not allege enough factual details to say when that happened.

*also JJ Holand Ltd. v. Fredrikson & Byron, P.A.*, No. 12-cv-3064 (ADM/TNL), 2013

WL 3716948, at *5 (D. Minn. July 12, 2013) (citing *Lamere*, 827 N.W.2d at 788).

Fraudulent concealment has been described as "a somewhat amorphous doctrine." *JJ

Holand*, 2013 WL 3716948, at *5 (citing *Wild v. Rarig*, 234 N.W.2d 775, 795 (Minn.

1975)).  Regardless, courts have identified some reasonably clear principles:

> To establish fraudulent concealment, a plaintiff must prove
> there was an affirmative act or statement which concealed a
> potential cause of action, that the statement was known to be
> false or was made in reckless disregard of its truth or falsity,
> and that the concealment could not have been discovered by
> reasonable diligence.

*Haberle v. Buchwald*, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992); *see also Block v.

Toyota Motor Corp.*, 795 F. Supp. 2d 880, 887 (D. Minn. 2011) ("Fraudulent

concealment requires that 'the concealment must be fraudulent or intentional and, in the

absence of a fiduciary or confidential relationship, there must be something of an

affirmative nature designed to prevent, and which does prevent, discovery of the cause

of action.'" (quoting *Wild*, 234 N.W.2d at 795)).  "Additionally, . . . allegations of fraud,

including fraudulent concealment for tolling purposes, [must] be pleaded with

particularity" under Rule 9(b).  *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d

986, 995 (8th Cir. 2007) ("This means the who, what, when, where, and how:  the first

paragraph of any newspaper story.") (quotation omitted); *see also JJ Holand*, 2013 WL

3716948, at *5 ("Because fraudulent concealment invokes fraud, the heightened pleading

requirements of Rule 9 apply." (citations omitted)).  "Fraudulent concealment will toll

the statute of limitations only if a party conceals the very existence of the facts giving

rise to the cause of action, such that the plaintiff was unaware the cause of action existed at all." *Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc.*, 964 F. Supp. 2d 993, 1008 (D. Minn. 2013).

Doe alleges facts plausibly showing fraudulent concealment, though this does not save her MHRA claim. She alleges that "[i]n 2004, Detective Larry Johnson told Jane Doe's mother that no DNA was found in the rape kit" when "[i]n fact, . . . Doe's rape kit was not tested." *See* Compl. ¶¶ 38, 40. In 2020, "Doe was informed that her . . . rape kit from the 2004 assault had been tested and was being used in a prosecution of the man she accused of sexually assaulting her because the DNA was a match." *Id*. ¶ 54. And Doe alleges that she "did not become aware, nor could she have been aware, of the Anoka County Sheriff's failure to test her rape kit until May 2020," *id*. ¶ 13, presumably when she was told the kit had been tested. Connecting these facts to fraudulent concealment's elements, Detective Johnson's statement concealed the failure to test Doe's rape kit, thus concealing any potential cause of action arising from the failure to test the kit. Considering his position within the Sheriff's office and the widespread non-testing of rape kits in Anoka County, it is at least plausible to infer that Detective Johnson either knew the statement was false or made the statement with reckless disregard of its truth or falsity. And it is plausible that Doe reasonably believed Detective Johnson, meaning Doe had no reason to investigate the issue further or independently. Doe's commencement of this action in December 2021, or roughly nineteen months after she learned of the delay in the kit's testing, means her § 1983 claims, her negligence claim, and her claim for intentional infliction of emotional distress are not barred by their corresponding six- and

two-year limitations periods. Doe's MHRA claim, however, is barred because, even on Doe's version of fraudulent concealment, she brought this case more than one year after learning of the discriminatory acts.

Doe argues that the continuing violations doctrine tolls the MHRA's one-year limitations period, but the Complaint does not allege continuing violations in the relevant sense. "The continuing violations doctrine is an equitable doctrine that can toll the statute of limitations where a pattern of discriminatory conduct 'constitute[s] a sufficiently integrated pattern to form, in effect, a single discriminatory act.'" *Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 70 (Minn. 2020) (alteration in original) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 440 n.11 (Minn. 1983)). "Under Minnesota law, each individual discriminatory act which is part of a continuing violation triggers anew the time period for reporting the entire pattern of discrimination, 'as long as at least one incident of discrimination occurred within the limitations period.'" *Id.* at 70–71 (quoting *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1172 (8th Cir. 2001) and *Treanor v. MCI Telecomms. Corp.*, 200 F.3d 570, 573 (8th Cir. 2000)). To prove a continuing violation of the MHRA, a plaintiff thus must show: "(1) a series of related acts, one or more of which fell within the limitations period, or (2) the maintenance of a discriminatory system both before and during the limitations period." *Smith*, 250 F.3d at 1172. "The critical question is 'whether any present *violation* exists' within the statute of limitations period." *Abel*, 947 N.W.2d at 71 (quoting *Sigurdson v. Isanti County*, 448 N.W.2d 62, 67 (Minn. 1989)). Here, Doe does not allege that discriminatory conduct occurred within the

one-year period between May 2020, when Doe learned her rape kit had not been tested, and May 2021. *See generally* Compl.

Defendants argue Doe has failed to show fraudulent concealment, but these arguments are not persuasive. Defendants argue that Doe failed to allege fraudulent concealment with the particularity Rule 9(b) requires. Defendants have a point; the single statement Doe relies on to show fraudulent concealment is barebones. Regardless, Doe identified the "who" (Detective Johnson), the "what" (the content of Detective Johnson's false statement—*i.e.*, that Doe's rape kit had been tested), the "when" (2004), and the "how" (that the statement was communicated verbally to Doe's mother). Compl. ¶¶ 6, 38. Doe did not allege "where" Detective Johnson made the statement, but it is difficult to understand why this allegation's absence might matter or be dispositive. Defendants argue that Doe "failed to exercise due diligence to pursue" her claims. Defs.' Mem. in Supp. at 18. To support this argument, Defendants cite a series of cases in which courts determined fraudulent concealment did not apply because a plaintiff or plaintiffs had not acted with reasonable diligence. *Id.* at 20–21. This is a closer question, but I conclude these cases are distinguishable in important ways. In *Jones v. Frost*, the reasonable-diligence issue was adjudicated on summary judgment. 770 F.3d 1183, 1185 (8th Cir. 2014). This case is in a motion-to-dismiss posture. The factual record concerning the reasonable-diligence question is not developed, and the Complaint's allegations show it was plausible for Doe to accept Detective Johnson's representation without further inquiry. In *Olson v. Amatuzio*, the plaintiff failed to take advantage of opportunities in a trial to discover claim-supporting evidence. No. 18-cv-124 (DWF/TNL), 2018 WL

4087944, at *5 (D. Minn. Aug. 27, 2018), *aff'd*, 799 F. App'x 433 (8th Cir. 2020). Doe had no trial or trial-like opportunity in which to exercise reasonable diligence. And in *Beckwith v. City of Houston*, the court determined that "the backlogged testing of [sexual assault kits] was public information" by virtue of a press release issued by the Houston Mayor's Office. 790 Fed. App'x 568, 573 (5th Cir. 2019). The press release, combined with the availability of "a hotline for sexual assault victims to obtain more information about their cases," gave the victim-plaintiffs an opportunity to inquire about the status of their cases. *Id.* The plaintiffs' failure to take advantage of these opportunities, the court concluded, showed they failed to exercise reasonable diligence. *Id.* at 573–74. Based on the Complaint's allegations, this case is different. There is no press release. There is no hotline. And though Defendants fairly point to a report prepared by the Minnesota Bureau of Criminal Apprehension regarding untested rape kits as a source from which Doe might have learned information regarding her case, the report is not specific to Anoka County, and neither the report's availability nor Doe's ability to access it are discernable from the record. Doe plausibly alleges fraudulent concealment.

## C

Defendants next challenge the merits of Doe's § 1983/Fourteenth Amendment equal-protection claim. "The Equal Protection Clause of the Fourteenth Amendment commands that no [s]tate shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The "first step" when

evaluating an equal-protection claim is to decide "whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her." *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 959 (8th Cir. 2019) (quoting *In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018)).  The second step is to decide whether the unequal treatment resulted from "intentional or purposeful discrimination." *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994).  The Sixth Circuit has described this test in the context of an equal-protection claim arising from a municipality's alleged failure to test sexual assault kits:

> For a plaintiff to succeed on an Equal Protection claim of sex discrimination, she "must show that she is a member of a protected class and that she was intentionally and purposefully discriminated against because of her membership in that protected class." *Jones v. Union County*, 296 F.3d 417, 426 (6th Cir. 2002).  The latter showing requires a demonstration that it is the policy or custom of Defendant to provide less protection to victims of sexual assault than those of other crimes, and that gender discrimination was the motivation for this disparate treatment. *See id.*  Absent direct evidence of discriminatory motivation, "[a] discriminatory effect which is severe enough can provide sufficient evidence" of such motivation under appropriate circumstances. *See United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (quoting *United States v. Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999)).

*Doe v. City of Memphis*, 928 F.3d 481, 487 (6th Cir. 2019).

Doe plausibly alleges these elements.  Doe's equal-protection theory—as the Eighth Circuit described it in the remand order—is that Defendants "fail[ed] to timely investigate the crime of sexual assault due to an alleged discriminatory animus against women and girls." *Doe*, 2024 WL 765008, at *1.  Doe plausibly alleges the hundreds of

rape kits Anoka County never tested or delayed testing (including her own) show a non-testing "policy, practice, or custom." Compl. ¶¶ 46, 47. Doe alleges the County's failure to test so many kits shows disparate treatment and discriminatory animus because "most, if not all, of the victims of sexual assault that provided evidence of the rape kits were women and girls." *Id.* ¶ 49. And she alleges that "[b]asic investigatory steps" taken in other types of cases where women and girls were not the exclusive victims "were not taken for sexual assault cases as a matter of course." *Id.* ¶ 62.

Defendants' arguments challenging the merits of this claim are not convincing. Defendants call Doe's assertion that sexual assaults were not investigated as thoroughly as other crimes a "conclusion, not a fact." Defs.' Mem. in Supp. at 24. The volume of untested rape kits permits the reasonable factual inference that sexual assaults received singularly deficient investigation in comparison to other crimes. Nor is it "speculative," as Defendants say, to infer a non-testing policy from the volume of untested kits. *Id.* Without knowing more, it is difficult to know how else to construe the volume of untested kits. Defendants argue that to plead her equal-protection claim, it is not enough for Doe to allege she was treated differently from other crime victims. *Id.* at 26. Instead, Defendants say, Doe must "allege that similarly-situated male victims of sexual assault were treated differently from female victims of sexual assault." *Id.* This asks too much. Persuasive authorities say that Doe may show an equal-protection claim by comparing sexual-assault victims' treatment to the treatment of victims of other types of crime. *See Doe*, 928 F.3d at 487 (explaining that a sexual-assault-victim plaintiff is similarly situated to victims of other crimes); *see Marlowe v. City & County of San Francisco*,

28

No. 16-cv-00076-MMC, 2017 WL 5973505, at *1 (N.D. Cal. Jan. 10, 2017) (recognizing that, to plausibly allege equal protection claim arising from less favorable treatment of sexual assault victims, plaintiff must show "that persons who reported other types of crimes were treated more favorably"), *aff'd*, 753 F. App'x 479 (9th Cir. 2019).  And the authorities Defendants cite to support this contention don't.  In *Ricketts v. City of Columbia*, the Eighth Circuit addressed an equal-protection claim alleging that "a municipality discriminated against women by failing to treat complaints of domestic abuse as seriously as complaints of nondomestic abuse."  36 F.3d 775, 779 (8th Cir. 1994).  The court held that:

> to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.

*Id.* (quoting *Hynson ex rel. Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 (3d Cir. 1988)).  The court, in other words, did not require a domestic-violence-against-women-versus-domestic-violence-against-men   comparison;   for   equal-protection purposes, victims of other violent crimes (not just domestic abuse) were similarly situated to victims of domestic abuse.  It is true the court later observed in a footnote that "a comparison of the arrest rate when men are victims of domestic abuse with the arrest rate when women are the victims" would be "[a] more accurate indicator of an intent to discriminate."  *Id.* at 781 n.2.  But the court nowhere indicated that the law required this specific comparison.  In *Harrison v. Woolridge*, the court denied a motion to dismiss an

equal-protection claim because the plaintiff "sufficiently alleged that [Defendants] treat male rape victims more favorably than female rape victims." No. 3:18-CV-00388-GNS-LLK, 2020 WL 3798877, at *5 (W.D. Ky. July 7, 2020). The fact that the plaintiff pursued her equal-protection claim based on this comparison does not mean the comparison was legally required, and a careful review of the court's opinion gives no reason to conclude the court thought that, either. The same can be said of the third case on which Defendants rely, *Rondini v. Bunn*, No. 7:17-cv-01114-RDP, 2018 WL 317713 (N.D. Ala. Jan. 8, 2018). There, the court dismissed the case because the sexual-assault-victim plaintiff had not alleged that male victims received more favorable treatment during criminal investigations. *Id.* at *8. The court did not say that only male sexual-assault victims could be similarly situated for purposes of an equal-protection analysis. Doe plausibly alleges her § 1983/Fourteenth Amendment equal-protection claim.

### D

Detective Johnson argues he is entitled to qualified immunity because Doe "has not stated a plausible claim for violation of a constitutional right that was clearly established in 2004 when he allegedly failed to submit her sexual assault kit for testing." Defs.' Mem. in Supp. at 30. Doe disagrees. *See* Pl.'s Mem. in Opp'n at 23–25. Notwithstanding the attention this issue receives in the briefing, as best I can tell from the Complaint, whether Detective Johnson possesses qualified immunity is not an issue. Doe asserts no constitutional claim against Detective Johnson. Doe asserts her constitutional claims against Anoka County and the Anoka County Sheriff, not Detective

Johnson.  *See* Compl. ¶¶ 7, 14.  Detective Johnson is not mentioned in either constitutional claim.  *See id.* ¶¶ 58–85, 100–107.  Doe names Detective Johnson as a defendant only with respect to her negligence and intentional-infliction-of-emotional-distress claims under Minnesota law.  "The federal doctrine of qualified immunity does not apply to claims brought under Minnesota law."  *Greiner v. City of Champlin*, 816 F. Supp. 528, 545 (D. Minn. 1993), *rev'd in part on other grounds*, 27 F.3d 1346 (8th Cir. 1994); *see Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009) (recognizing that "qualified immunity is a doctrine of *federal* common law" and does not apply to state claims); *see also Mawhirt v. Ahmed*, 8 Fed. App'x 125, 127 (2d Cir. 2001) (recognizing that, "[b]ecause a violation of state law is not cognizable under § 1983, the federal law doctrine of qualified immunity does not apply to state law claims" (quotation and citation omitted)).  Qualified immunity is not an issue.

## E

Defendants argue that Detective Johnson is entitled to official immunity under Minnesota law and that, by extension, all other Defendants are entitled to official immunity vicariously through Detective Johnson.  "As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion."  *Heard v. City of Red Wing*, 393 F. Supp. 3d 785, 792 (D. Minn. 2019) (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)); *accord Ward v. Olson*, 939 F. Supp. 2d 956, 964 (D. Minn. 2013) (quoting *Dokman v. County of Hennepin*, 637

N.W.2d 286, 296 (Minn. Ct. App. 2001)).  If an official's actions require the exercise of discretion, he is entitled to official immunity "unless the official committed a willful or malicious wrong."  *Heard*, 393 F. Supp. 3d at 792 (citing *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992)).  "Generally, police officers are classified as discretionary officers entitled to [official] immunity."  *Ward*, 939 F. Supp. 2d at 964 (quoting *Johnson*, 453 N.W.2d at 42); *see also Yang v. City of Brooklyn Park*, 194 F. Supp. 3d 865, 874 (D. Minn. 2016) ("Under Minnesota law, official immunity protects police officers engaged in law enforcement efforts unless they act with subjective malice." (quoting *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006))).

As a reminder, Doe sued Detective Johnson in two of her five claims—for negligence and for intentional infliction of emotional distress.  The issue, then, is whether Doe has plausibly alleged that Detective Johnson acted willfully or maliciously in connection with these claims.  In answering this question, "courts consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited.  This contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions."  *Heard*, 393 F. Supp. 3d at 792 (cleaned up) (quoting *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007)); *see also Brown v. City of Golden Valley*, 574 F.3d 491, 500–01 (8th Cir. 2009) ("In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful

violation of a known right.'" (quoting *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991))).

The malicious-wrong exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico*, 472 N.W.2d at 107. "The determination of whether an officer acted maliciously or willfully is usually a question of fact for the jury." *Ward*, 939 F. Supp. 2d at 964 (citing *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988)).

The Complaint's taken-as-true allegations plausibly establish the malicious-wrong exception with respect to Doe's intentional-infliction-of-emotional-distress claim but not with respect to her negligence claim. The Complaint's allegations supporting the intentional-infliction claim plausibly show that Detective Johnson acted maliciously and had reason to know his actions were prohibited. According to the Complaint, the decision not to test rape kits, including Doe's, was intentional in the sense that it resulted from longstanding policy or custom. Compl. ¶ 47. Detective Johnson's misrepresentation that Doe's kit had been tested and the large number of untested kits supports the Complaint's allegations that Detective Johnson knew of the policy and participated in its implementation, and that the failure to test was intentional. *See id.* ¶¶ 15, 38, 46–48. And, according to the Complaint, "most, if not all, of the victims of sexual assault" whose rape kits went untested "were women and girls," leaving the plausible inference that the kits' non-testing discriminated based on sex. *Id.* ¶ 49. Detective Johnson had reason to believe the discriminatory way the investigations were conducted was prohibited because the right to non-discriminatory administration of police investigative services—that is, investigative services not based on the victim's race or sex—was clearly established.

*DeShaney*, 489 U.S. at 197 n.3 ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."); *Ricketts*, 36 F.3d at 779 ("[A] municipality may not operate under a custom in which it selectively den[ies] its protective services to certain disfavored minorities without violating the Equal Protection Clause." (quotation and citation omitted)); *Elliot-Park*, 592 F.3d at 1008 (citing cases); *cf. Engquist*, 553 U.S. at 604 ("Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns."). Based on the Complaint's allegations, Detective Johnson is not entitled to official immunity as to Doe's claim for intentional infliction of emotional distress.

For basic legal reasons, the negligence claim is different. "Official immunity applies to the negligent acts of a public official performing duties that call for the exercise of judgment or discretion." *Ireland v. Crow's Nest Yachts, Inc.*, 552 N.W.2d 269, 272 (Minn. Ct. App. 1996) (citing *Elwood,* 423 N.W.2d at 677); *Jepsen ex rel. Dean v. County of Pope*, 966 N.W.2d 472, 482 (Minn. 2021) ("Application of official immunity means that persons who suffer injuries as a result of a public official's discretionary conduct generally have no civil recourse against the negligent public official (and often against the government itself) and are left to bear the costs and burdens of their injuries themselves."); *see N.S. v. Kan. City Bd. of Police Comm'rs*, 933 F.3d 967, 971 (8th Cir. 2019) ("Official immunity, for example, is available unless the officer acted in bad faith or with malice, which requires more than just bad judgment or negligence." (cleaned up)).

On these rules, Detective Johnson is entitled to official immunity on Doe's negligence claim. And Doe's failure to respond to Defendants' vicarious-official-immunity argument means this claim must be dismissed as to Sheriff Stuart as well.

F

Anoka County argues it is entitled to immunity pursuant to Minn. Stat. § 466.03, subdiv. 6. *See* Defs.' Mem. in Supp. at 34–36.[5] Minnesota's Municipal Tort Claims Act "presumes that every Minnesota municipality is liable for its torts and torts committed by its officers, employees, and agents acting within the scope of their employment." *Doe 601 ex rel. Doe 601 v. Best Academy*, --- N.W.3d ---, A22-1236, 2025 WL 621284, at *6 (Minn. Feb. 26, 2025) (citing Minn. Stat. §§ 466.01–.15 (2024)). "The Act, however, also enumerates several exceptions to the general rule of liability, most of which address very particular government actions." *Id*. (citing Minn. Stat. § 466.03). Relevant here,

---

[5]     To be clear, whether Anoka County is entitled to immunity under Minnesota law seems like a moot point. Doe named Anoka County in just two of her five claims, the § 1983/Fourteenth Amendment equal-protection claim and the Minnesota Human Rights Act claim. *See* Compl. at 7, 12. Though the parties have not addressed the issue, the Minnesota Supreme Court has "rejected the suggestion that Minnesota law controls the immunity question in a Section 1983 action." *Elwood*, 423 N.W.2d at 677 (citing *Finch v. Wemlinger*, 310 N.W.2d 66, 69–70 (Minn. 1981)). And the weight of authority is that state-created immunities do not apply to § 1983 claims. *See, e.g.*, *Himes v. Stephens*, 270 F. App'x 575, 578 (9th Cir. 2008) (holding that Nevada discretionary-immunity statute "is not applicable to federal claims"); *Moncrief v. City of Montgomery*, No. 2:23-cv-331-JTA (WO), 2024 WL 4142655, at *4–5 (M.D. Ala. Sept. 10, 2024) (holding that Alabama-created immunity did not apply to § 1983 claims and collecting cases); *Jones v. W. Va. Div. of Corr. & Rehab.*, No.: 3:22-cv-00366, 2024 WL 2228968, at *10 (S.D.W.V. Feb. 13, 2024) ("West Virginia's state qualified immunity standard does not apply to this suit, which strictly raises federal claims under § 1983."). The Minnesota Human Rights Act claim is out of the picture because it fails based on the statute of limitations. Regardless, for the sake of completeness, the Minnesota-law discretionary-acts immunity issue will be addressed.

Minn. Stat. § 466.03, subdiv. 6, provides a discretionary-function exception to municipal tort liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subdiv. 6; *see Doe 601*, 2025 WL 621284, at *1 n.2 ("[S]ubdivision 6 is an exception to the general rule that a municipality is subject to liability for the torts that the municipality commits."); *see also id*. at *7.

Unlike official immunity, which "protects *individual government actors* against personal liability for actions taken while performing their duties," "the discretionary-function exception . . . provides immunity to *government entities*." *Doe 601*, 2025 WL 621284, at *7 n.12. The discretionary-function exception is interpreted "narrowly" with a "focus on the purpose underlying the exception," which is "to assure that the courts do not pass judgment on policy decisions entrusted to coordinate branches of government" and to "prevent[] tort actions from becoming a vehicle for judicial interference with executive and legislative policymaking." *Holmquist v. State*, 425 N.W.2d 230, 231 (Minn. 1988); *see also Doe 601*, 2025 WL 621284, at *7 ("[T]o balance the important competing interests in protecting legislative and executive branch prerogatives in making public policy and providing relief to Minnesotans who have been harmed through the fault of a third-party (here, a municipality), we have interpreted the discretionary-function exception narrowly."); *see also Doe 601*, 2025 WL 621284, *12 ("[T]he discretionary-function exception is construed narrowly to avoid precluding Minnesotans from recovering for injuries caused by municipalities' tortious conduct unless necessary to avoid judicial branch interference with policymaking activities best left to the

legislative or executive branch."). "[T]he discretionary function exception does not immunize a government entity from liability for its conduct simply because a government actor exercises discretion"; rather, "discretion for purposes of the discretionary-function exception . . . refers specifically to the exercise of judgment used in the context of *policymaking*." *Doe 601*, 2025 WL 621284, at *7 (citing *Watson ex rel. Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 412 (Minn. 1996)).

"The analysis of whether the discretionary-function exception applies must start with identifying the precise government conduct being challenged in a tort claim." *Doe 601*, 2025 WL 621284, at *9 (citing *Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 219 (Minn. 1998)); *see also id*. at *12 (same). Then, "[t]he critical inquiry is whether the [challenged] conduct involved a balancing of policy objectives." *Doe 601*, 2025 WL 621284, at *8 (quoting *Steinke v. City of Andover*, 525 N.W.2d 173, 175 (Minn. 1994)). In conducting that "critical inquiry," the Minnesota Supreme Court has identified "analytical tools that include asking whether a decision is a planning decision (which is a public policy decision shielded from tort liability) or an operational decision (which is subject to tort liability)":

> Planning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. In simpler terms, planning level decisions require the balancing of policy objectives.
>
> Conversely, operational level decisions involve decisions relating to the ordinary day-to-day operations of the government. Decisions are operational, even when they involve professional judgment or the application of scientific and technical skills in carrying out established policy, as long

> as the decision does not involve a balancing of objectives in
> setting a policy.

*Id.*, 2025 WL 621284, at *8 (quoting *Jepsen ex rel. Dean*, 966 N.W.2d at 488–89). "This is a circumstances-specific inquiry." *Id.* at *12.

"[T]he municipality bears the specific burden of proving that the challenged conduct is the subject of the type of legislative or executive branch policymaking protected by the discretionary function exception—conduct involving balancing competing social, political, economic, or financial considerations." *Id.* at *9. "Generally, [the] municipality must 'produce evidence its conduct was of a policy-making nature involving social, political, or economic considerations, rather than merely professional or scientific judgments.'" *Id.* at *10 (quoting *Steinke*, 525 N.W.2d at 175); *see also Angell v. Hennepin Cnty. Reg'l Rail Auth.*, 578 N.W.2d 343, 347 (Minn. 1998)). The municipality thus "must produce evidence of 'how it made the decision for which it claims immunity,'" but may not rely on "[b]road, conclusory assertions that it based its decision on economic, social, political, and financial factors." *Doe 601*, 2025 WL 621284, at *10 (quoting *Conlin v. City of Saint Paul*, 605 N.W.2d 396, 402 (Minn. 2000)).

Here, the parties identify the precise government conduct being challenged in different ways. Defendants argue the relevant conduct is "[h]ow to conduct a criminal investigation" or "how they decided to best use their limited resources to investigate crimes in 2004." Defs.' Mem. in Supp. at 35. Doe, on the other hand, identifies the

relevant conduct as "a policy decision to discriminate against female sexual assault victims and not test rape kits."  Pl.'s Mem. in Opp'n at 27.

No matter how the conduct is characterized, the Minnesota Supreme Court's recent decision in *Doe 601* directs the outcome against the application of statutory immunity on this motion.  In *Doe 601*, the Minnesota Supreme Court addressed as a matter of first impression whether a municipality's activity broadly labeled as a "hiring decision" was "categorically and necessarily a policy-level decision involving weighing competing economic, social, political, and financial considerations for purposes of the discretionary-function exception to municipal tort liability" under Minn. Stat. § 466.03, subdiv. 6.  2025 WL 621284, at *5.  Minor Doe, through his mother, brought a claim for negligent hiring against Best Academy, a Minneapolis charter school, after a teacher at the school sexually assaulted him.  *Id.* at *1.  Doe claimed that if Best Academy had "done a proper review of [the teacher's] background, including, but not limited to, obtaining reference letters and contacting the references that [the teacher] provided," it would have revealed the teacher's prior sexual abuse and prevented Best Academy from hiring him.  *Id.* at *14.  In granting summary judgment in favor of Best Academy based on the discretionary-function exception, the district court reasoned that a municipality's decision to hire an employee is "always a planning-level policy decision shielded from tort liability—even absent any evidence that the municipality weighed competing policy considerations in making the decision," and the Minnesota Court of Appeals affirmed. *Id.* at *2.  The Minnesota Supreme Court reversed, finding that Best Academy had not met its burden of showing that it "decided, after balancing competing economic, social,

political, and financial factors," that it need not obtain reference letters or contact references for the teacher. *Id.* at *14. Specifically, the record provided "no evidence about how the hiring practices and protocols that Best Academy used were developed," and Best Academy "failed to demonstrate that its conduct in failing to more thoroughly investigate [the teacher's] background . . . was based on weighing competing social, economic, political, and financial considerations." *Id*. at *15. Absent this evidence, the Minnesota Supreme Court found that the discretionary-function exception did not apply categorically to "hiring decisions." *Id*. at *14.

Here, just as in *Doe 601*, Defendants do not explain how decisions regarding how best to conduct a criminal investigation, investigate a sexual assault, or whether to test a rape kit reflect the "exercise of judgment used in the context of *policymaking*" at all, *id.* at *7, resting instead on the assertion that their decision was a "classic example of a policy and planning-level decision," Defs.' Mem. in Opp'n at 35. Defendants do not explain who decided, what deliberation took place, or what considerations were weighed in deciding. And "nothing in the record or in the nature of the decision" about how to best conduct criminal investigations (or whether to investigate sexual assaults or test rape kits) "suggests that it would be reasonable or appropriate for us to infer (in the absence of evidence) that the decision involved weighing competing economic, political, social, or financial considerations." *Doe 601*, 2025 WL 621284, at *15. Considering the case's procedural posture, the absence of these facts is understandable. Regardless, Defendants have not met their burden of showing that Anoka County's "conduct was a policy decision involving weighing competing economic social, political, and financial factors,"

*id.*, meaning the discretionary-function exception to municipal tort liability does not justify judgment on the pleadings.[6]

G

Sheriff Stuart argues the claims against him should be dismissed on two grounds, but neither is convincing. First, Sheriff Stuart argues he "was not elected to serve in his official capacity until 2011, long after the events at issue here." Defs.' Mem. in Supp. at 36. It is not accurate to say that the Complaint concerns only events preceding Sheriff Stuart's election. *See* Compl. ¶¶ 10–13. Second, Sheriff Stuart cites the rule that a Sheriff's office in Minnesota is not an entity subject to suit. Defs.' Mem. in Supp. at 36; *see, e.g.*, *Johnson v. Hennepin County*, No. 23-cv-66 (ECT/DTS), 2023 WL 7195241, at *3 (D. Minn. Nov. 1, 2023). Sheriff Stuart cites no authority equating an official-capacity suit against a sheriff with a suit against the office for this rule's purposes. And though there is room for confusion, the better understanding is that the Complaint does not name the Anoka County Sheriff's Office as a defendant. Though the Complaint lists the "Anoka County Sheriff's Office" in a section titled "**THE PARTIES**," the sheriff's

---

[6]     *Doe 601* identifies a separate reason not to apply the discretionary-function exception. As the Minnesota Supreme Court explained, "[t]he discretionary-function exception . . . does not shield conduct which clearly violates an express policy adopted by a controlling authority from litigation and liability—*even if* that policy was adopted by balancing competing economic, social, political, and financial considerations— because such conduct cannot be characterized as 'discretionary.'" *Id*. at *14 (quoting *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 787 (Minn. 1989)); *see Cairl v. State of Minn.*, 323 N.W.2d 20, 27 (Yetka, J., dissenting) ("[T]he doctrine of discretionary immunity does not apply where specific standards of conduct as set forth in statutes, regulations, or court orders are violated." (citation omitted))).

office is not identified in the Complaint's caption.  *See* Compl. at 1.  These arguments do

not justify Sheriff Stuart's dismissal.

### ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT**

**IS ORDERED THAT** Defendants' Motion for Judgment on the Pleadings [ECF No. 28]

is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.  The motion is **GRANTED** with respect to Plaintiff Jane Doe's claims

under the Minnesota Human Rights Act (Count 2) and for negligence (Count 4).

Accordingly, these claims are **DISMISSED WITH PREJUDICE**.

2.  The motion is **DENIED** in all other respects.

Dated:  March 10, 2025                              s/Eric C. Tostrud
                                                             Eric C. Tostrud
                                                             United States District Court